**Petition of McALLISTER et al.**
**THE NO. 75.**

District Court, S. D. New York.
Nov. 4, 1931.

Elliott, Jones & Fanning, of Brooklyn, N. Y. (Jay S. Jones, of Brooklyn, N. Y., of counsel), for claimant.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and R. H. Caldwell, both of New York City, of counsel), for Pennsylvania R. Co., contingent claimant.

Alexander, Ash & Jones, of New York City (Lawson Jones, of New York City, of counsel), for petitioners.

WOOLSEY, District Judge.

My decision in this cause is that the petitioners may have a decree exonerating them from liability for the accident set forth in their petition, but that such decree shall not carry costs against the claimants.

I. This petition was brought by the owner of the lighter No. 75 in order to stay an action in the New York Supreme Court and to secure a trial in admiralty instead of at law with a jury, of a claim for the death on March 29, 1929, of Edward A. Gilbertson, engineer on the lighter No. 75, brought by his widow as his administratrix.

The administratrix of Gilbertson has filed a claim in the limitation proceeding, and the petitioners pray for a decree of exoneration from liability for this claim, and, in the alternative, if held liable, for a limitation of their liability to the value of the lighter as damaged after the accident which is the occasion of this suit.

II. In all cases of petitions of this kind, the first question to be determined is the liability of the petitioner, for if there is not any liability there is not anything against which to limit.

On the issue of liability in such a proceeding, the same burden lies on the claimant to make out a case of liability by a fair preponderance of the evidence, as lies on every party who has the affirmative side of any issue in a civil case.

For the purpose of chancering the evidence on the issue of liability herein, therefore, I shall first deal with the case as if the administratrix claimant had filed a libel against the petitioners.

III. At about 1:05 p. m. on Friday, March 29, 1929, Edward A. Gilbertson was killed by a most unusual kind of accident whilst working as engineer on board the steam lighter No. 75 at Robins Dry Dock, Erie Basin, N. Y.

Before it is possible to form any theory of the cause of the tragedy out of which this litigation arose, it is necessary to understand the locus in quo of the accident, the rigging and dimensions of the mast and boom whose collapse caused it, and the method in which they were normally operated in the handling of cargoes.

The steam lighter No. 75 was 100.5 feet long, had a width of 29 feet, a depth of 8.5 feet, and a carrying capacity of 219.17 tons. She had square ends and was, therefore, a box-like structure with a length slightly less than four times her width.

Midships aft she had a round mast of wood which rose about 60 feet above her deck, and was from 22 to 24 inches in diameter.

This mast was held braced in order to meet the strains which would be encountered in dealing with the heavy weights raised by the boom and tackle, by ten steel stays. Two of the stays led from near the top of the mast to the side of the lighter to a point at an angle of about 20 degrees forward of the mast. There were then two stays which led opposite to each other directly to the side of the lighter from the mast, two more which led angling aft of the mast at the same angle as the first mentioned stays angled forward,

two more stays leading to the after corners of the lighter, and two more which led to the stern at such angles as would bring each stay to a point on the stern one-third of the distance from each corner thereof.

The effect of this radiating arrangement of stays was that, as the boom swung, one stay after another came into play to take the principal strain, although it was assisted, of course, by the neighboring stays. In other words, as the boom swung, the plane of the greatest stresses cut successively through the plane created by the mast and the stay opposite to the boom at any given time.

Just forward of this mast and raised slightly above the deck was a socket in which the stepping at the foot of the boom was lodged and in which it could revolve as the boom was swung from side to side in operation.

The boom was about 65 feet long and of about the same diameter as the mast. Aft of the mast there was a deckhouse containing a donkey boiler and a winch which operated the boom and the tackle therewith connected.

The normal method of operating the boom was to raise it by the use of a topping lift till it was fixed at such an angle as would put its head over the cargo which was to be handled. This was accomplished by the use of one of the drums on the winch which was operated by a man in the deckhouse.

There was a second drum on the winch which controlled the fall, which was used to raise or lower the drafts of cargo after they had been slung and their slings had been fastened to the fall.

In order that the boom might be under control as it swung from one side to the other of the lighter, there were two guys made of manila rope 3½ inches in circumference, which ran through appropriate leads on the deck near the sides of the lighter to the head of the boom so that the boom could be pulled either to port or to starboard as might be desired. These guys were operated on two devices known as niggerheads on the port side of the winch.

After a draft of cargo is raised, the drum, around which the fall raising it is wrapped, is kept by a foot brake from lowering its load, and so long as the foot brake is held pressed down the draft will not drop.

IV. On the occasion in question a man by the name of Reitveld, who was the captain of the lighter, was running the winch and handling the fall by which the cargo was raised. Reitveld also had charge of the tackle for raising or lowering the boom, which, of course, is a more infrequent operation than the use of the falls to raise and lower the drafts of cargo, or the use of the guys to swing the boom from one side to the other of the lighter.

The decedent Gilbertson was running the guys on the niggerheads.

V. On the Monday morning before the accident, March 25th, the No. 75 was in the Wallabout and the Pennsylvania Railroad Company sent a tug over which fetched her to Greenville and there she commenced loading. She took on board a cargo of piling, steel ship plates, and steel rivet bars—so called because steel rivets are made from them. The plates and the bars were stowed thwart ships and extended substantially from side to side of the lighter.

The lighter was loading on Monday and Tuesday, March 25th and 26th; and on Wednesday, March 27th, she was taken over to Robins Dry Dock, where, lying with her starboard side to a pier, she started to unload on the afternoon of Thursday, March 28th, the day before the accident. On that afternoon and Friday morning she unloaded some rivet bars.

VI. The accident happened on Friday, March 29th, while the No. 75 was attempting to unload the first sling load of plates, weighing about 5½ tons.

This sling load had been made up and put into chain slings before the men who were working the lighter went to their luncheon, and immediately after their return Reitveld went to the winch, turned on the steam, and Gilbertson commenced to operate the guys.

The plates were then found to be caught under the piling on the deck of the lighter which overlapped them three or four inches, and in order to get them free it was necessary to swing the draft to port, although the lighter was lying with her starboard side to the dock and that was the direction which the plates would ultimately have to be swung in order to reach the dock where they were to be loaded.

The whole lifting mechanism was capable of safely lifting ten tons for a string-piece landing, that is, for a landing on the dock, in which the boom would not be swung at right angles over the side of the lighter, but would be merely swung quartering forward at an angle of about 45 degrees.

The weight of the draft which was being raised at the time of the accident was about 5½ tons. It is therefore obvious that the

lifting mechanism was not overloaded for normal operation at that time.

VII. Reitveld claims, but I find it is not the fact, that by reason of the method of discharge of the lighter, before the discharge of the draft in question commenced, she had acquired a slight list to port, and it is to this list and to the alleged breaking of the starboard guy rope that Reitveld attributed the sudden swing of the boom with the draft on it, hereinafter described, toward the port or offshore side of the lighter.

I find that the lighter was substantially on an even keel and in quiet water, and that any port list which might have been observed at the time was due undoubtedly to the weight of the draft, which, until it was released by Reitveld's taking his foot off the brake, would naturally cause the lighter to list more and more to port as the boom swung in that direction from the center line of the lighter's deck where it had been attached to the draft.

Reitveld's story is that the starboard guy rope, which was used to swing the boom to starboard, broke, and that, consequently, there was not anything to prevent the boom from swinging to port, especially as the lighter was listed in that direction; that when the guy broke, the boom swung suddenly over to port, that he released his foot brake and let the draft go overboard, and that at about the time when the boom got over the port side of the lighter, he heard a sound like a crack which he thinks meant that the forward starboard stay then gave way.

Thereupon he says he leapt out of the cabin, the mast broke and fell quartering aft, and the boom went overboard in the same direction, having been thrown out of its stepping by the sudden swing of the draft to port, with the result that as the mast broke it fell on the cabin crushing it and killing Gilbertson, who had remained within.

It is a curious and horrible fact that a part of Gilbertson's arm was found caught on the niggerhead in the coils of the port guy rope, with about as many coils inside his arm as outside it.

Reitveld claims, somewhat urgently, that when he leapt from the cabin he noticed that Gilbertson's hands were both free. I find, however, that the position of Gilbertson's arm when found in the coils of the port guy make this impossible in view of the fact that the collapse came almost instantaneously after Reitveld got out on deck.

I cannot, therefore, accept entirely the story as told by Reitveld, although I think that he was probably endeavoring in the main to tell his version of a confused situation correctly. I watched him carefully whilst he was testifying, and it seemed to me that he was holding something back. I venture to think that what he was holding back was the fact that he saw Gilbertson's arm get caught in the port guy, as hereinafter described, and, in his natural horror of the situation, did not stop the engine and let the draft go promptly as might have been desirable.

This, of course, is only conjecture but, even if the truth of it were established, I should not hold this to have been negligence on Reitveld's part under the unusual circumstances which existed, for few men would rise to such an emergency. But nevertheless the fact that a man had not done so, but had got safely out himself, might be a memory which would always haunt him and would probably tend to make him, when opportunity offered, try to salve his regrets by giving evidence which would at least be colored in favor of the man of whose terrible end he had been a witness.

This is one of those cases where the mechanisms we have to consider were in motion when the accident happened, and in which the accident happened so suddenly that the recollections of those who witnessed it are necessarily somewhat different and somewhat confused.

It is helpful, therefore, to consider certain aspects of the matter which necessarily control the evidence which was given.

In the first place, it is common ground that so long as Reitveld kept his foot on the brake of the drum controlling the fall which was raising the draft of cargo, the draft would not drop.

It is also common ground that the draft actually did drop over the side, that when the boom went over the side it led aft, and that the mast in breaking fell backwards quartering to port over the deckhouse, and after the accident, lay on the port quarter of the lighter on top of the wreck of the deckhouse.

It is perfectly obvious that the draft would never have gone over the side if Reitveld had not kept his foot on the brake, and that the stay and the mast would not have broken unless the full weight of the draft had been on them. Therefore, Reitveld must have had his foot on the brake during the period while the boom was swinging with the

heavy strain of the 5½-ton draft on it and on the mast with its rigging.

I accept the story of the employees of the Robins Dry Dock, whom I found to be excellent witnesses, that the boom swung around so far to port, that it struck the port forward stay of the mast, and that then the corresponding starboard stay gave way and also the next starboard stay after that. I find that the carrying away of the forward starboard stay caused the mast to fall, and that the starboard stay next aft was torn out when the mast fell.

VIII. It seems to me that when one has, as here, a kinetic situation with so great a weight involved, it is not possible to invoke the doctrine, conveniently called res ipsa loquitur, and that, therefore, we must look for some definite proof that the cause of the accident was either in the wrongful manipulation of the boom after the draft of plates got caught under the piling, as I find it did, or else to a faulty condition of the first stay which gave way.

I do not think it is possible to ascertain with any degree of precision, or in any event I cannot on the record before me, the amount of the strain which would have been put on the boom and on the stay and other tackle by the sudden swing of the boom over the port side with a 5½-ton draft, but I find that it actually did swing so that it struck the port forward stay which was fastened on the rail only a few feet forward of the mast, in a position opposite to and corresponding with the starboard stay which broke.

It is perfectly clear that there was a time, apparently just before the stay gave way, when the boom 65 feet long was projecting at about right angles over the port side of the lighter with a weight of about 5½ tons attached to it, and for that instant there must have been an enormous strain put on the stays on the starboard side, because not only was the weight of the draft, amounting to about 5½ tons at the end of the boom, contributing to that strain, but the boom itself was heavy and when it struck the forward port stay, it must have bent that stay and possibly the next stay aft as if they had been bow strings. This would, I find, put suddenly a very great and probably not even approximately calculable pulling strain on the stays on the starboard side opposite or nearly opposite to the port stays mentioned. The starboard stays which broke were so positioned as to confirm this finding.

I find that the crack which Reitveld first heard was the sound made when the boom, as it swung, hit the forward port stay, and I find that this jarred the rigging so much that the starboard forward stay carried away, and then, of course, the collapse of the mast was inevitable.

The break of the mast showed clean wood and a direction of strain which quartered aft and is consonant with my findings.

The lighter had been generally overhauled about two months prior to this accident, and at that time, it was testified to, there was some shifting of the rigging and it then seemed, on examination, to be in perfectly good condition.

Apparently, it is customary for lighters of a kind like the No. 75 to lie with their starboard side toward the piers on which they are discharging, and, consequently, the principal strains are apt to come on the port rigging, for that reason it has become customary among lighter owners when any renewals or changes of rigging are made, to put the new rigging on the port side and move the old rigging from the port side, if in proper condition, to the starboard side.

Such transfer from port to starboard was made on the above-mentioned overhaul of the No. 75, and I find that there then was not anything in the condition of the stays or other rigging so moved which should have cast suspicion on it.

From an accident such as has been described, with a large weight swaying around, apparently uncontrollably, I do not see any reason for inferring from the breaking of the rigging, so recently overhauled, that such rigging was not in proper condition.

I do not believe the story which Reitveld told on the stand of his unheeded complaints as to guys and stays at the time of this overhaul. This kind of evidence is so common in negligence cases that it has to be scrutinized with the greatest care. Here these complaints are denied by the petitioner's superintendent who, when he was on the stand, appeared to me to be a very honest man, and perhaps more important still they are not mentioned in Reitveld's statement and affidavit made just after the accident.

Even if it could be inferred that he would not have mentioned these complaints to his employers for fear of getting into difficulty with them, or, if he had mentioned them, that they would have been left out of the statements purposely by the petitioners, the complaints would certainly have been mentioned to the Pennsylvania Railroad Company if they had in fact been made, for the railroad

company took an affidavit from Reitveld, and being in the position of a potential defendant, would have welcomed most cordially any such evidence, as tending to throw liability on the petitioners. It is to be remembered that the railroad was taking the affidavit to protect itself in the event of a suit against it as charterer of the lighter for damages due to the accident, either by Gilbertson's administratrix or by the owners of the cargo which had been lost overboard.

It seems clear to me, therefore, that this tragic accident must be considered to have been an accident of operation and that it is not shown to have involved any organic defects in the rigging or equipment of the lighter.

I do not think that any rigging could be devised which would insure reasonable safety of operation when a load of between 5 and 6 tons was running wild at the end of a 65-foot boom under the circumstances here shown. And, therefore, a failure of rigging under such circumstances does not justify an inference of its faulty condition.

IX. I find that what happened was that the decedent Gilbertson put pressure on the port guy at the niggerhead to pull the draft free from the piling, and that when the draft swung free he did not stop pulling with the port guy, probably because his arm was caught in its coils.

As to the fact that the draft of plates caught under the piling on deck, the evidence is overwhelmingly in favor of the petitioners, for petitioners' independent witnesses, the employees of Robins Dry Dock, who, I thought, were noticeably careful not to testify to anything which they did not actually see, are unanimous on this point.

I find, therefore, that the draft did catch under the piling.

I find the swing of the boom to port was not caused by the breaking of the starboard guy as Reitveld claimed. For although there is some conflict in the evidence as to whether the starboard guy broke or not, I find that it did not break.

This is in accordance with the evidence of two surveyors, whom I believed, and who both said they found the port and starboard guys both intact the next day. I feel confirmed in the correctness of this finding by the fact that Reitveld did not lay the accident to the breaking of the starboard guy in either the statement or in the affidavit which he made just after the accident.

The breaking of the starboard guy would have been an easy and obvious way of explaining the commencement of the series of misfortunes which culminated in Gilbertson's death, and is another matter, which, if it had occurred, would, I think, certainly have been mentioned, if not in the written statement made by Reitveld on March 29, 1929, two days after the accident, at least in his affidavit to the railroad company, sworn to on April 2, 1929, within a week thereof, which have been marked in evidence as petitioners' exhibits. In his affidavit Reitveld mentions that Gilbertson was tending both guys and says that a starboard *stay* carried away.

The accident occurred so suddenly and was over so quickly that it is very difficult to reconstruct exactly what did happen, but from the fact that a great length of the port guy was found wound around the niggerhead with part of Mr. Gilbertson's left arm in it—about as much outside his arm as inside it—I find that the accident cannot on this record be attributed to a failure to inspect the stays or the other rigging but probably should be attributed to the fact that Gilbertson negligently operated the port guy rope and got his hand caught in it, and in the excitement of the moment when the boom swung swiftly to port and the draft went wild, he and Reitveld were unable, quite naturally, to do anything to get control of the situation.

An examination of the winch after the accident indicated perfectly clearly that the port guy rope had been evidently pulling the boom around during the entire period of its swing. The length of the port guy which was wound around the niggerhead is mute but irrefutable testimony of this fact.

So, summing the matter up after hearing the witnesses for the petitioners, I find a plausible explanation of the fact that the draft swung to port, i. e., its snapping free of the piling under which it was caught due to the pressure put on it by the port guy rope controlled by Gilbertson, and the fact, as the examination after the accident showed, that the port guy kept on winding up around the niggerhead and thus accelerated the port swing of the draft until it hit the forward port stay.

That was not an expectable way in which to handle such a heavy load, and even if the record does not affirmatively indicate that the accident was due to Gilbertson's own negligence, it certainly does not warrant an inference that the defendants were negligent in respect of their inspection of the rigging and gear which they furnished the lighter on which he was working.

**X.** The so-called doctrine of res ipsa loquitur involves nothing more than that the party claiming damages has produced proof of a fact or a series of related facts from which, according to the long experience of men, an inference is warranted that the party sued has been guilty of some failure of duty towards the party claiming damages from him. It does not mean that such an inference is compelled. It is merely a rule of good sense based on crystallized experience. It does not relieve the party suing of his burden of proof. It merely puts on the party sued the duty to go on with evidence and contradict it, or, if he can, explain how the accident came to occur otherwise than as described by the plaintiff. Cf. Sweeney v. Erving, 228 U. S. 233, 240, 33 S. Ct. 416, 57 L. Ed. 815; Erie Railroad Co. v. Murphy, 9 F.(2d) 525, 526 (C. C. A. 2); Kraljer v. Snare, 221 F. 255, 256 (C. C. A. 2).

In Sweeney v. Erving, 228 U. S. 233, 33 S. Ct. 416, 57 L. Ed. 815, Mr. Justice Pitney admirably summarized the so-called res ipsa loquitur rule when he said at page 240 of 228 U. S., 33 S. Ct. 416, 418:

"In our opinion, res ipsa loquitur means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they make a case to be decided by the jury, not that they forestall the verdict. Res ipsa loquitur, where it applies, does not convert the defendant's general issue into an affirmative defense. When all the evidence is in, the question for the jury is whether the preponderance is with the plaintiff.

"Such, we think, is the view generally taken of the matter in well-considered judicial opinions."

It is perfectly obvious that if more than one party may have participated in the act or acts in respect of which negligence is claimed, before the trier of the facts can infer negligence and allow a recovery he must be able to fix the person against whom the negligence is to be inferred by some circumstances which irrefutably point the finger of liability to that person; for it is only on a definite basis such as this that a court is justified in taking the money of one man and giving it to another. That is the principle underlying the decision of our Court of Appeals in Actiesselskabet Ingrid v. Central Railroad Company of New Jersey (The E. I. DuPont de Nemours Co. and James Healing), 216 F. 72, L. R. A. 1916B, 716 (C. C. A. 2), a case in which I was of counsel.

Here Gilbertson was managing the petitioners' hoisting mechanism, and the question is whether the accident was due to his management thereof or to an inherent defect therein. In effect Gilbertson and the petitioners were participants in an accident allegedly involving negligence, and I think it is perfectly clear that in view of the manner in which the accident happened here it is impossible to exclude the possibility that it was due to the negligence of Gilbertson himself.

The tragic discovery, after the accident, that a piece of Gilbertson's arm had been cut off by the port guy and that the port guy was wound around it, indicated, as above mentioned, that the port guy had been pulling the boom to port during the entire movement which resulted in the accident. It certainly looks as if Gilbertson himself had allowed the situation to get out of hand— whether through negligence or mere accident matters not.

Under such circumstances, it seems to me that it would be quite improper to infer any negligence on the part of the owners of the No. 75 from the fact that the stay broke and the mast fell, and that is the only method of making out any liability on the part of the petitioners for there is not any direct evidence of negligence.

The claimant, therefore, has failed to sustain the burden of proof, and, on this record, so far as credible evidence is concerned, the question of petitioners' fault is within what Judge Thomas called, in The Baron Innerdale (D. C.) 93 F. 492, at page 493, the domain of pure surmise—a domain which fortunately for me is outside my jurisdiction.

**XI.** I find that as the claimant has not made out a case of liability on the part of the petitioners, they are entitled to a decree of exoneration but without costs.

**XII.** An order providing that this opinion may stand as the findings of fact and conclusions of law in this case may be presented for signature.

Thereafter the petitioners may submit a decree granting them exoneration but not carrying costs.

Order and decree to be settled on two days' notice.